**Petition of FLORIDA POWER & LIGHT CO.**
Docket No. 760727-Eu.     Order No. 8032.
Florida Public Service Commission.
November 2, 1977.

---

Appearances: William C. Steel and Shepard King of Steel, Hector & Davis, Miami; John W. McWhirter, Jr., Tampa; William L. Weeks, General Counsel, Public Service Commission; Prentice P. Pruitt, counsel for commission staff; Office of the Public Counsel, C. Earl Henderson, Associate Public Counsel, attorneys for the citizens of Florida; George B. Stallings, Jr., Jacksonville; Salley, Barns & Pajon, Miami; Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee; Walter T. Dartland, Dade County Consumer Advocate; Leo Foster, Florida Hotel and Motel Association; Roland H. Moore, Eastern Airlines, Inc.; Donald P. Young, et al, General Services Administration, Washington, D. C.

The following commissioners participated in the disposition of this matter — PAULA F. HAWKINS, Chairman, and Commissioners WILLIAM T. MAYO and WILLIAM H. BEVIS.

BY THE COMMISSION.

*Order denying petition for reconsideration:* By Order No. 7843, dated June 16, 1977, we entered a decision on the request of Florida Power and Light Company for an increase in rates. That order established, inter alia, that a fair rate of return for the company is 9.16%, and that, of the total request of $349,000,000 in additional annual revenues, it is entitled to receive $195,496,841. By the instant petition, the company has asked us to reconsider three aspects of that decision — the inverted rate structure adopted for the residential class of customers; the multiplier established for collection of franchise fees; and our refusal to allow $25 million in unrecovered fuel expense as a test year operating expense. Tampa Electric Company also intervened so as to be heard on the residential rate issue.

The inverted rate structure has been challenged on numerous grounds. Principally, the company contends that no notice of the commission's intent to consider the inverted rate structure was given during the proceeding; the legislature has not delegated to the commission express statutory authority to implement the inverted rate structure; the rate design is not supported by the record; and the design does not conform to testimony offered in Docket No. 73694-EU, the investigation of rate design of electric utilities initiated by this commission four years ago. In an alternative argument, FP&L urges that the subject of the residential rate design be incorporated into this existing docket.

The residential rate design prescribed by Order No. 7843 has become the most controversial aspect of this rate case. After careful deliberation, we have decided to affirm and retain the residential rate, as we are convinced that it is a reasonable effort to attain a legitimate objective and that, over time it will benefit the majority of Florida Power and Light Company's customers.

Prior to the entry of Order No. 7843, FP&L's residential rate consisted of a flat customer charge of $3.23, a charge of 3.303¢/kwh for the first 750 kwh consumer, and a charge of 3.085¢/kwh for each kilowatt hour in excess of that consumption. That rate design reflected the inclusion of the applicable portion of the interim rate increase, in the amount of $87,877,577 annually, which was granted by Order No. 7668 issued in this docket on March 4, 1977.

To achieve the presently existing residential rate, we directed in Order No. 7843 that the additional increase authorized for the residential class of customers therein be placed upon consumption greater than 750 kwh. The charge for the initial 750 kwh remained as it was established after the interim increase. As a result, the charge for the second "block" of consumption was set at a level slightly higher than that for the initial 750 kwh of use — an "inversion" of the traditional "declining block" structure. As stated in Order 7843, the purpose of our decision was to provide to those customers having a high consumption of electricity an economic incentive to avoid the unnecessary consumption of energy. In doing so, we took official notice of the urgent need nationwide to make wiser use of irreplaceable natural resources. In addition, as noted in Order No. 7843, the record in this case demonstrates the impact upon the consumer of the necessity of adding increased capacity during times of persistent inflation and dramatically rising construction costs.

The requirement of adding generating capacity to rate base at higher unit costs results in attrition of the company's rate of return, which leads to the request for additional rate increases. To the extent that wasteful use of electricity contributes to the demand

for more plant, we believe that the economic incentive offered by the rate design in question can help to curb the need for additional expensive generating capacity.

As pointed out during oral argument by public counsel, who supports the residential rate established in Order No. 7843, the record in this case supports our action in other respects as well. The company's objection to the rate design in question stems in large part to the amount charged per kilowatt hour. In terms of cents/ kwh, the level of the charge which we established was lower than that recommended by Dr. Frederick Welles, a witness who testified on behalf of public counsel. Dr. Welles, who advocated prices based upon marginal costs, recommended as a step toward that end a flat rate per kilowatt hour with no separate customer charge. Even more significantly, his testimony specifically advised against continuation of the declining block structure (TR-4922). At another point, the witness' testimony embraced and approved the "inverted" concept —

"Rates based on marginal costs would be above the existing and proposed FP&L rates and, for reasons indicated below, should be flat *or even tilted upward* as usage increases." (TR-4915, emphasis added)

Thus, the issue of the appropriate rate design for residential customers was controverted during the hearing. Our decision did not go as far as Dr. Welles' ultimate objective of marginal cost pricing, which would entail revenues greater than the company's present requirements. However, the rate design we established is consistent with important aspects of this testimony, including the objectives of conservation and the avoidance of unnecessary plant additions.

The company's argument with regard to Docket No. 73694-EU has no force. While recommendations were submitted in that docket, we have not finalized that matter and are not bound by anything presented therein. As for the question of notice, the company is aware that the issues inherent to a major rate case reach all aspects of rate structure. There is no requirement that the commission provide separate notice of each detail it wishes to consider. *Plant City v. Mayo,* 337 So.2d 966 (1976). Moreover, as has been indicated, the issues addressed by Order No. 7843 were sufficiently reached by testimony of record to identify the matter as one which the commission might consider.

With regard to the company's challenge of our statutory authority to adopt the inverted rate, we note that Florida statutes do not delineate any one prescribed rate design. Chapter 366, Florida statutes, requires only that the rates we set be fair, just, and reasonable. Substantial discretion is left to the commision to make

judgments within those guidelines, and we believe that our decision herein comports with the statutory requirements.

While the company argues that the residential rate would work a "hardship" on its customers, its own petition states that over half its residential ratepayers have bills for less than 750 kwh per month on an annual basis.

We acknowledge that the conservation rate is somewhat experimental. However, operating experience under the rate will soon enable us to evaluate the degree to which it is achieving the desired result. Of course, if for any reason it becomes evident that the rate design is creating undesirable effects, we have the authority under law to implement a proceeding for the purpose of making any needed modification to the rate structure.

Order No. 7843 required FP&L to reduce its franchise fee multiplier from 3.847% to 3.705%. This reduction was made because the former multiplier enabled the company to collect franchise fees "on top of" franchise fees. The proposition was correctly stated by the company in the example used in its petition for reconsideration —

"Under the commission's interpretation of FP&L's liability. if a customer received a bill from FP&L in the amount of $106 (excluding taxes) of which $100 was for general service and $6 for franchise fees, FP&L would only owe the municipality 6% of $100 and not 6% of $106 or $6.36."

The company protests our action on the basis of "no competent, substantial evidence," but revealingly does not argue that the interpretation is wrong. Rather, it requests authority to continue the higher multiplier so that it will not be harmed in the event the municipalities attempt to collect the greater amount. In our opinion, the matter is basic. A person who makes a 1.00 purchase in a state having a 4% sales tax owes taxes computed by applying 4% x $1.00, *not* 4% x $1.04. No useful purpose would be served by permitting a contrary result in this instance.

Florida Power and Light Company included in its computation of net operating income slightly more than $25 million in unrecovered fuel costs. In Order No. 7843, we disallowed this amount as an operating expense, stating as follows —

"We agree with public counsel and with FIPUG that unrecovered fuel costs should be disallowed in this proceeding. The unrecovered fuel costs are the result of the two month lag that the cost recovery clause currently employs. Rather than allow the company to include any under-recovery or over-recovery of fuel costs

in a general rate proceeding, we feel it would be appropriate for the company to recover those amounts through the mechanism of the cost recovery clause."

We continue to adhere to this position. In Order No. 7843, we pointed out that during the first three months of 1977, the company experienced an over-recovery of fuel expenses because of the two-month lag. In its petition, FP&L argues that this has been true of the initial period of each of the last three years, but that the end of each of those years has reflected a net loss. If anything, this demonstrates that the experience of public utilities with regard to fuel costs can be expected to continue to fluctuate, and that the clause can be expected to perform its function over time of reflecting variations in the cost of fuel.

For the above reasons, we believe the petition for reconsideration should be denied. Accordingly, it is ordered that the petition for reconsideration filed herein by Florida Power and Light Company and that filed by Tampa Electric Company be and the same are hereby denied. It is further ordered that Order No. 7843 be and the same is hereby affirmed in all respects.

Commissioner BEVIS, dissenting in part.

The belated reasoning expressed in the majority opinion in support of the inverted rate structure is like trying to grasp for a cushion large enough to support your vehicle's fall after you have driven a cement truck off a cliff. Some of the crowd may be excited about seeing whether you can make it fly, but the law of gravity, the laws of economics, and the laws of men are not so accommodating to cement trucks or to the inverted rates implemented in this case.

The inverted rate structure should not have been implemented herein. It was never made the subject of any public hearing held on the rate application filed by Florida Power & Light Company. It was "announced" at the agenda conference at which this case was decided.

The Florida Power & Light Company case produced 5,333 pages of testimony, 130 exhibits containing over 1,800 additional pages, 24 days of public hearings, and 3 agenda conference days during which the commission reviewed the case and rendered its decision. Therefore, a single sentence on page 4915 of the transcript which the majority claims "embraced and supported" the "inverted" concept does not appear to constitute competent, substantial evidence upon which this radical change in rate structure can be predicated. Nor do I consider the notice requirements of due process to have been approached, much less to have been met in this case.

Such a public furor developed after PSC adoption of inverted rates for the FP&L service area that Gulf Power Company and Tampa Electric Company demanded that evidence be taken on the inverted rate issue in their subsequent rate hearings. Based on the evidence in those two records, this commission did not adopt inverted rates in either of those two cases.

A substantial part of the reasoning for my dissent here is set forth in my dissent in the original order issued by the commission on this subject. (Docket No. 760727-TP, Order No. 7483) General procedural aspects were also discussed in my special concurring opinion in Docket No. 760727-TP, Order No. 7871. I will not duplicate those comments here, but they are very informative about many aspects of this case.

The majority here seems to miss the point on how fundamental fairness should apply to the ratepayers. A substantial portion of their logic depends on the suggestion that if more than a majority of ratepayers would pay lower rates under the inverted rate structure than under the traditional declining block rate structure, then the severe burdens placed on a (presumed) minority of the ratepayers are irrelevant, no matter how severe. This is politics at its worst.

This discrimination has no justification and no basis in the record of this case. The failure of the majority to allow the full and careful study of the inverted rate proposal, the specific rate levels that would be implemented, and the consequences that would result therefrom warrants the reversal of the decision rendered in Order No. 7843. In the agenda conference upon which the present order is based, the majority suggested that up to 84% of the customers of the FP&L service area *may* benefit from the inverted rate structure. I am skeptical as to the percentages of FP&L's customers who may be "helped" by the inverted rate structure during various times of the year. Merely taking a rate structure which is *radically* different from a prior rate structure and applying those new rates to prior consumption data generated under the old rates is not a very accurate or professional method of projecting future benefits.

In addition, there is no justification for an "experiment" to see what the effects of the ill-conceived, un-studied residential rates implemented in this case will do to the customers. We as commissioners have a duty to be more careful than that.

Since the issue of an inverted rate structure was not brought up until the last day of the agenda conference on this rate case, it was difficult to devote enough thought to this issue to comprehend all of its ramifications at that time. However, after having an opportunity to consider the nature of the inverted rate, there is reason-

able doubt as to whether this commission has the authority to implement an inverted rate structure such as the one implemented in this case. The per-kilowatt hour charges in the two blocks which comprise the inverted rate are totally devoid of any relation to cost.

The Florida Public Service Commission was created by the Florida legislature. It has been given vast authority over the regulation of private electric (and other) utilities in Florida. (See especially Chapters 350 and 366, Florida Statutes). However, this commission has only the authority which is specifically granted to it in the statutes or which reasonably may be inferred from the specific wording of the statutes. The statutes do not authorize the commission, either explicitly or implicitly, to engage in income redistribution or social welfare programs.

Therefore, when the statutes were passed by the legislature and, indeed, until the commission ordered its "inverted rates" in Order No. 7843 in this case, rates were related to the costs the companies incurred in serving their customers. I can find no place in any statute where the Florida Public Service Commission has been given authority to redistribute income or to engage in social welfare activities.

While the Public Service Commission has the duty to regulate utilities as an exercise of the police power of the state for the "welfare" — or well-being — of the state's citizens, it does not appear to have the authority to engage in the type of "social welfare" which involves income redistribution, subsidization, or the taking of income or accumulated wealth from one person or group and giving it directly or indirectly to another person or group. There are two separate and distinct uses of the word "welfare."

By contrast, the Florida legislature has created a Florida Department of Health and Rehabilitative Services to deal with "social welfare" and many other issues in Florida. It is responsible for implementing the Florida statutes which provide a comprehensive social welfare program throughout the state.

It might be suggested that the so-called "cost related" declining block rates (or any form of rates for that matter) cannot reflect the *exact*, to-the-penny cost of providing the utility service and thus result in some slight income redistribution. This statement obviously is correct. However, this reflects the minor shortcomings of the administrative and regulatory tools with which we must work, and the deviations away from "cost" are minimal. It also reflects the practice of many state utility commissions, such as this one, to make certain minor adjustments to cost-based rates for policy reasons. However, the inverted rate structure (which was voted

on as a "lifeline" rate but implemented as a "conservation" rate) has as its specific purpose the provision of service to residential classes which are in no way related to costs. In fact, the per-kilowatt hour charges in both blocks of the inverted rate structure totally ignore any recognized principle of rate design and are based instead on social considerations.

In *Gulf Oil Co. v. Bevis*, 322 So.2d 30, at 34 (Fla. 1975), the dissent observed that —

"The commission's fear for [the small, independent marketers'] ability to survive and compete in today's energy-short economy is commendable. The commission may not, however, depart from the essential requirements of law in a contested administrative proceeding in order to decide interesting social questions. The commission, like all other agencies of government, is obliged to protect the public interest by using lawful procedures."

By way of comparison of the ability of various state agencies to perform social functions, the Florida Public Service Commission has 344 employees to perform all of its regulatory responsibilities. The Florida Department of Health and Rehabilitative Services has over thirty thousand employees, many of whom are engaged directly or indirectly in performing analysis of social needs and in performing welfare services of various kinds.

In closing, I can only conclude that the moral of this Florida Power & Light Company case is that if you render decisions like those which the Public Service Commission must render, you must comply with the law and the constitution — *unless* you also drive a cement truck. In that case, let the citizens beware.

Commissioner HAWKINS, concurring specially.

I fully support the decision herein to sustain the energy conservation rate structure. I wish to add a few brief words lest a reader of this order be deceived by Commissioner Bevis' heavy logic (cement trucks).

The record in this case fully supports the implementation of this rate structure. The record is replete with evidence of the ever increasing costs of utility plant expansion.

When rates were last set for FP&L the average unit cost per KW of production plant was approximately $199/KW. In 1976, Manatee Unit No. 1 was added to plant in service at a cost of $232/KW and St. Lucie No. 1 was added at a cost of $655/KW. Testimony in the recent FP&L case indicated that the future costs per KW will

be above $1,000 for either coal or nuclear powered units completed and placed into service in the 1980's.

Testimony by the expert witness for the public counsel's office clearly demonstrated that the old declining block rate — supported by Commissioner Bevis — is not cost based but actually is giving discounts to large users, while forcing small users to pay more than "cost" on a per KWH basis.

It is true that no party to this proceeding advocated the exact rate structure ultimately adopted, but it is also true that no party advocated the exact amount of the rate increase ultimately awarded. This commission has broad discretion to review the evidence and set rates and rate structures which are fair — this it has done.

The rate structure change was not based on "social" considerations. Commissioner Bevis knows that. Nevertheless he again tries to claim that the conservation rate is "social ratemaking" and that the commission doesn't have the authority to set rates on that basis. I believe Commissioner Bevis is simply setting up a "straw man" to disguise the fallacies of his own position.

Finally I find it absolutely astounding that Commissioner Bevis suggests that the majority is missing the "point on how fundamental fairness should apply to the ratepayers."

Commissioner Bevis would not recognize fundamental fairness if it ran over him in a cement truck.

It is not fundamentally fair to approve an unnecessary and exorbitant rate increase of $195 million for this company which is again reporting record earnings, while many ratepayers can't afford even the basic essentials of life because their power bills are so high. In many cases electric bills are even more than mortgage payments.

It is not fundamentally fair to approve a rate increase of over $133 million for Southern Bell, a company in perhaps its best financial condition ever, while many ratepayers can simply no longer afford to have a telephone.

Nevertheless, Commissioner Bevis has taken both of the stands put forth above — how ironic it is that he now suggests that one of the few actions this commission has taken which is truly in favor of the consumer, is not fundamentally fair. What he really means is — it's not fair because the company opposes it.